Mary KELLEY

v.

**ACTION FOR BOSTON COMMUNITY DEVELOPMENT, INC., et al.**

**No. CA 74–2916–T.**

United States District Court,
D. Massachusetts.

Aug. 16, 1976.

Saul A. Schapiro, Cambridge, Mass., for Mary Kelley.

Ropes & Gray, Thomas G. Dignan, Jr., John H. Mason, Boston, Mass., for Boston Community Development, Inc., South Boston Action Council, Inc.

## OPINION

TAURO, District Judge.

This is an action for injunctive relief and damages brought by a former teacher employed by Project Head Start claiming that she was fired in violation of her rights under the Fifth and Fourteenth Amendments. After the parties submitted an agreed statement of facts, the plaintiff's claim was taken under advisement on the merits.[1]

### I.

The plaintiff is a resident of South Boston, Massachusetts.

Defendant Action for Boston Community Development, Inc. (ABCD) is a non-profit corporation duly organized under Mass.Gen. Laws ch. 180 with its principal office in Boston. ABCD has been designated by the City of Boston as a community action agency within the meaning of § 210 of the Economic Opportunity Act of 1964, 42 U.S.C. § 2790. It is also a grantee agency within the meaning of the Economic Opportunity Act of 1964.

Defendant South Boston Action Council (SBAC) is also a non-profit corporation organized under Mass.Gen.Laws ch. 180 with its principal office in South Boston. SBAC is a neighborhood-based organization within the meaning of § 211 of the Economic Opportunity Act of 1964, 42 U.S.C. § 2791. It is also a delegate agency within the meaning of the Economic Opportunity Act of 1964.

Head Start is a day care educational program for pre-school children of three to six years. Ninety percent of these children must be from low income families. Head Start was established pursuant to § 222 of the Economic Opportunity Act of 1964, 42 U.S.C. § 2809.

Since January 1, 1970, the Head Start Program has been administered at the federal level by the Office of Child Development of the Department of Health, Education and Welfare. Prior to that time, it had been administered by the Office of Economic Opportunity. The Federal government has always provided 80 percent of its funding.

ABCD receives funds from the Department of Health, Education and Welfare which it in turn disburses to SBAC. SBAC is responsible for the operation of the Head Start Program in South Boston. Funds received by ABCD and disbursed by SBAC to Head Start constituted the source of the plaintiff's salary while she was a Head Start teacher and teacher trainee. ABCD also receives some funds from the Commonwealth of Massachusetts, although none of those funds are channeled to the Head Start Program.[2]

ABCD's primary function is to initiate and assist in the development of programs to aid needy residents of the City of Boston. The programs in which ABCD is involved cover a wide front. They include social services such as the delivery of health care, alcoholism counseling, educational activities, and assistance to consumers and senior citizens. ABCD also addresses itself to the reduction of urban unemployment and crime. ABCD's Board of Directors includes persons designated by the respective "action councils" in neighborhoods throughout the city as well as representatives of business, labor, education and other groups.

SBAC was established in 1964 and its primary activity has been to coordinate and administer a variety of social programs in South Boston. SBAC is financially dependent upon ABCD but is otherwise autonomous from ABCD. During the 1971–72 and 1972–73 school years, SBAC operated four Head Start classrooms in South Boston, in-

---

1. In detailing the facts of the case, the court has also relied upon the uncontradicted affidavits of the parties.

2. The parties have stipulated that although some funding for ABCD is provided by the Commonwealth, none of it reaches the Head

Start Program. Of course, the governor must approve every Head Start grant, 42 U.S.C. § 2834, and the Commonwealth at one time "guaranteed" funding for Project Head Start should federal funds evaporate. Ch. 1179 of the Acts of 1973.

cluding the Old Colony Head Start classroom and two D Street Head Start classrooms. Each of these classrooms had a parents' committee which consisted of all parents of children who were then attending Head Start classes in that classroom. Each parents' committee elected two representatives to serve for two years on the SBAC Head Start Policy Committee. The Head Start Policy Committee in turn designated one of its members to serve on the Board of Directors of SBAC.

The plaintiff was hired by SBAC on July 3, 1967, and, after a three month probationary period, she became a permanent employee of SBAC on September 25, 1967. On March 1, 1971 she became a Head Start teacher although she is neither a college graduate nor a teacher certified by the Commonwealth.

During the 1971–72 school year, the plaintiff was employed as the Head Start teacher for one of SBAC's two D Street Head Start classrooms. On September 16, 1971, Ms. Mary Beth Lawton, then Head Start Program Coordinator for SBAC, informed Nicholas Avitabile, Executive Director of SBAC, that she had given the plaintiff a verbal warning of possible termination. In a written memorandum to Avitabile, Lawton listed four specific areas of concern: Mrs. Kelley's failure to administer medicine to one of her students for an asthma condition; her inability to work well with members of her team and other members of the staff; her frequent tardiness; and her insensitivity to many of the Spanish-speaking families in the area. The plaintiff, however, remained in the program through the end of the academic year.

During the 1972–73 school year, the plaintiff was reassigned to the SBAC's Old Colony Head Start classroom. Soon after the semester began, on October 20, 1972, Ms. Lawton submitted to the plaintiff a "written warning" listing the plaintiff's continued unsatisfactory job performance.

The October 1972 memorandum named five specific problems including: "inappropriate intervention with children;" sporadic posting of satisfactory lesson plans; lack of overall classroom organization and control; failure to requisition supplies in a proper manner; and one specific instance of "irresponsible behavior," *i. e.,* leaving a field trip before knowing that all children were safely returned to their homes. Ms. Lawton indicated that these problems had been repeatedly discussed in the past and that she would recommend the plaintiff's termination if her performance did not improve.

Eventually, complaints by parents led to the plaintiff's dismissal by Nicholas Avitabile effective May 4, 1973.[3] Four days later, the SBAC Head Start Policy Committee indicated its support for this decision. The plaintiff challenged her dismissal through the SBAC Grievance Committee which, after several days of hearings, upheld the Director's action in a written decision filed October 15, 1973. Approximately ten months after the Grievance Committee decision was filed, the plaintiff commenced this action.

The plaintiff's original complaint was that the procedure followed by the defendants in terminating her employment violated the due process clauses of the fifth and fourteenth amendments, because she had not been provided with written notice and an opportunity to be heard *prior* to her discharge. She also claimed that the procedures followed by the defendants in terminating her employment violated numerous HEW regulations and ABCD personnel policies in several different respects. Subsequently, the plaintiff filed an amended complaint in which she included the additional claim that the defendants' termination procedures violated the due process clauses of the fifth and fourteenth amendments because the hearing she was ultimately provided was not "impartial." The basis for this charge was her allegation that certain members of the Head Start Policy

**3.** The events leading up to the plaintiff's termination as well as the grievance proceedings themselves will be described in more detail in Part II, B, 3 of this opinion. The agreed statement of facts indicates that the termination became effective May 4, 1974. Presumably this is a typographical error. *See* Exhibit E to the Statement of Agreed Facts.

Committee that had previously approved her termination, were also members of the Grievance Committee.

## II.

### 42 U.S.C. § 1983

The plaintiff claims that because (1) she failed to receive a hearing *prior* to her discharge; and (2) the hearing she did receive following her discharge was not impartial, she was deprived of her rights under the due process clause of the fourteenth amendment. She therefore seeks relief under 42 U.S.C. § 1983.[4]

### A.

### State Action

■ Section 1983, of course, does not provide a claim against private parties, *Berrios v. Inter American University*, 535 F.2d 1330 (1st Cir. 1976); *Fletcher v. Rhode Island Hospital Trust National Bank*, 496 F.2d 927 (1st Cir. 1974), nor against federal officials, *Soldevila v. Secretary of Agriculture*, 512 F.2d 427, 429 (1st Cir. 1975), but only those persons[5] acting "under color of state law." The threshold question, therefore, in connection with the plaintiff's claim under section 1983 is whether the defendants' actions were taken "under color of state law."[6]

■ Plaintiff cites two theories in support of her contention of state action. First, that extensive oversight and regulation of the local Head Start programs by Massachusetts makes the actions of Head Start administrators state action. Second,

that Project Head Start performs a "governmental function synonomous with that performed by the state."[7]

Although the state of Massachusetts provides no direct financial assistance to the Head Start Program, much of its regulation of pre-school day care centers is applicable to Project Head Start. For example, the Office of Children has established regulations governing admissions policies, transportation of children, physical plant and equipment, the number and general qualifications of staff, the nature of treatment programs, health care and nutrition, parents' rights and responsibilities, record keeping, and organization and finance. *See generally* Mass.Gen.Laws ch. 28A, § 10(c). These regulations undoubtedly have considerable impact on the day-to-day operation of any Head Start classroom in the Commonwealth. Such regulation, however, is insufficient to support a finding that the actions complained of here were done "under color of state law."

In *Powe v. Miles*, 407 F.2d 73 (2d Cir. 1968), several students attending the private liberal arts school at Alfred University were suspended following their disruption of an ROTC ceremony. In challenging their suspensions under section 1983, the students contended that pervasive regulation of higher education made the disciplinary actions of the University the actions of the state. The court, speaking through Judge Friendly, found the contention "unpersuasive." The court noted that

[i]t overlooks the essential point—that the state must be involved not simply with some activity of the institution al-

---

**4.** The jurisdictional basis for plaintiff's section 1983 claim is 28 U.S.C. § 1343.

**5.** In view of the ultimate disposition of plaintiff's section 1983 claim, the court does not reach the question of whether the defendants are "persons" within the meaning of that section.

**6.** The terms "state action" and "under color of state law" are used interchangeably. *Fletcher v. Rhode Island Hospital Trust National Bank*, 496 F.2d 927, 929 n. 4 (1st Cir. 1974).

Whether the lack of state action is a jurisdictional defect or a defect in the substantive

claim, is a matter of some dispute. *Compare Powe v. Miles*, 407 F.2d 73 (2d Cir. 1968) (Friendly, J.) *with Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir. 1975) (Stevens, J.).

**7.** The plaintiff does not claim that ABCD and SBAC's incorporation as a non-profit organization by Massachusetts transforms its actions to those "under color of state law." As Judge Friendly has noted "not even those taking the most extreme view of the concept have ever asserted that state action goes that far." *Powe v. Miles*, 407 F.2d 73, 80 (2d Cir. 1968).

leged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of complaint.

*Id.* at 81. (citations omitted).

A few months ago, the Seventh Circuit, speaking through then Judge Stevens observed:

> It is settled . . . that the mere existence of detailed regulation of a private entity does not make every act, or even every regulated act, of the private firm, the action of the State. [footnote citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176–77, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).] Unless it is alleged that the regulatory agency has encouraged the practice in question, or at least given its affirmative approval to the practice, the fact that a business or an institution is subject to regulation is not of decisive importance. [footnote omitted].

*Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 826 (7th Cir. 1975).

In the instant case, although Massachusetts may be intimately involved with providing day care services to pre-school children, there is no indication that this regulation extends so far as to include the sanctioning, approval or even toleration of procedures for the discharge of Head Start employees. Nor is there evidence in the record that officials of the state knew of, or were in any way involved in the decision to terminate the plaintiff or that state courts or other processes were used to effectuate that decision. *Compare Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

Certainly, there is no indication that the "freedom of decision-making" available to the community action agencies to discharge employees for cause "has been circumscribed" in any way by actions of the state. *See McQueen v. Druker,* 438 F.2d 781, 784–85 (1st Cir. 1971).

The plaintiff's public function argument seems to be based on two lines of cases. One starts with *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), where the actions of a private company were found to be state action when it owned and operated a company town having "all the characteristics of any other American town." *Id.* at 502, 66 S.Ct. at 277. For a time, *Marsh* had been applied in other areas, *see Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). *Logan Valley,* however, has now been explicitly overruled, *Hudgens v. National Labor Relations Board,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), and it seems unlikely that *Marsh* can today be applied beyond the peculiar facts there.

In a second line of cases, the Court held that certain activities or facilities are so clearly governmental in nature that the state cannot be permitted to escape responsibility for their administration merely by allowing them to be managed by a supposedly private agency. *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (party nominating procedures); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (same); *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (public park). Education, however, "has never been a state monopoly in this country, even at the primary and secondary levels," *Powe v. Miles,* 407 F.2d 73, 80 (2d Cir. 1968), and only recently, the First Circuit has recognized that courts have generally been reluctant to find from factors such as financial assistance and public regulation "that a private university is a state actor." *Berrios v. Inter American University,* 535 F.2d 1330, 1332 (1st Cir. 1976). Certainly, pre-school day care centers, which involve far less state regulation, and are farther from being a traditional state concern than private universities, can hardly be considered so peculiarly public in character as to constitute a "governmental function," for purposes of section 1983. *Compare Buckton v. N. C. A. A.,* 366 F.Supp. 1152 (D.Mass.1973).

Accordingly, this Court holds that there is insufficient state action to bring the defendants' alleged actions within the ambit of section 1983.

### B.
### Substantive Claim

Assuming *arguendo,* that the plaintiff has satisfied the state action requirement, her section 1983 claim must fall on the merits.

■ The plaintiff contends that she had a property interest or an expectancy of employment as an SBAC Head Start Teacher which could not be divested without first affording her an impartial hearing.[8] The plaintiff's substantive claim therefore embodies three elements. First, that her expectation of continued employment rises to the level of a "property interest" requiring constitutional protections before she can be terminated. Second, if the plaintiff's termination has indeed been a taking of property, the process that is due her in this situation consists of a *prior* administrative hearing. Third, the hearing to be provided must be an impartial one.

### 1.
### Property Interest

■ In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Court held

> [P]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Moreover, last Term, in dealing with a claim under 42 U.S.C. § 1983 brought by a former policeman challenging his termination, the Court observed: "[a] property in-

terest in employment can, of course, be created by an ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood,* —— U.S. ——, ——, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). (footnote omitted). Where that "independent source" does not supply a property interest, the federal constitution does not offer procedural protections.

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

*Id.* —— U.S. at ——, 96 S.Ct. at 2080. (footnote omitted).

In the instant case, although the plaintiff has made the general allegation that she was deprived of a "property interest" when she was terminated, there is no evidence to indicate the source of that "interest" under state law. The plaintiff has cited no Massachusetts statute or regulation governing her service in SBAC. *Compare* Mass.Gen. Laws ch. 31. Nor have the parties introduced evidence of an explicit written or oral contract governing the terms and conditions of the plaintiff's employment.

The parties have stipulated that the plaintiff was promoted from a "teacher

---

8. The plaintiff has not claimed that she has been deprived of a "liberty interest" as a result of her termination. Nor is there any basis for a claim that her "good name, reputation, hones-

ty, or integrity" were impaired by any action of the defendants. *See Bishop v. Wood,* —— U.S. ——, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

trainee" to a "permanent" employee in September 1967 and to "teacher" in 1971. Unfortunately, the plaintiff has not provided any clear evidence of the rights and duties of a "permanent" employee and one implication from the record is that the phrase "permanent employee" might be no more than a euphemism for an "employee at will." In any event, there is insufficient evidence in this record to permit this court to imply from the conduct of the parties some form of contractual arrangement which would rise to the level of a "property interest" thereby triggering constitutional protections.

2.

Prior Hearing

Even assuming, however, that the plaintiff has been deprived of a property interest, the constitutional protections to which she would then be entitled would not include a hearing *prior* to her termination.

■ In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court ruled that a non-probationary OEO employee did not have a constitutional right to a full-scale hearing prior to his termination for cause. Three members of the Court relied upon the specific language of the Lloyd-LaFollette Act, 5 U.S.C. § 7501, which governed dismissal of a federal civil service employee. That Act provided for a hearing only "in the discretion of the officer making the removal," a condition which the plurality concluded limited the employee's property interest for due process purposes. 416 U.S. at 148–58, 94 S.Ct. at 1642. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Six members of the Court disagreed with this approach. They concluded that the employee's procedural rights could not be limited to those which were specifically provided for in the statute and that *Roth* required a hearing at *some* stage in the termination

proceedings. Only four of those six, however, went on to conclude that the employee was entitled to a hearing *prior* to his termination. Justices Blackmun and Powell found that no such prior hearing would be necessary.

In the present case, the Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline. Such factors are essential if the Government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony and ultimately impair the efficiency of an office or agency. Moreover, a requirement of a prior evidentiary hearing would impose additional administrative costs, create delay, and deter warranted discharges.

416 U.S. at 168, 94 S.Ct. at 1651. Thus whatever the differences among the members of the Court, the First Circuit has held that *Arnett* stands for the proposition "that there is no constitutional right to hearing *prior* to suspension or discharge from government service even for a non-probationary employee." *Soldevila v. Secretary of Agriculture,* 512 F.2d 427, 430 (1st Cir. 1975) (emphasis supplied). *See also McFarland v. United States,* 517 F.2d 938 (Ct. Claims 1975); *Mills v. Long Island Railroad Co.,* 515 F.2d 181 (2d Cir. 1975).[9]

The plaintiff's reliance on the pre-*Arnett* cases of *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly,* 397

---

**9.** In the Court's subsequent decision in *Bishop v. Wood, supra,* the majority concluded that the plaintiff had not been deprived of a property interest under state law. The majority consisted of the three members of the *Arnett* plu-

rality plus Justices Powell and Stevens. Justice Blackmun, who had joined Justice Powell in the crucial concurring opinion in *Arnett,* dissented from the majority's reading of state law in *Bishop.*

U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), is misplaced. The plurality in *Arnett* noted that these cases "deal with areas of the law dissimilar to the area of governmental employer-employee relationships," 416 U.S. at 155, 94 S.Ct. at 1644; for none required the court to balance the employee's interests against "the Government's substantial interest in maintaining the efficiency and discipline of its own employees." 416 U.S. at 168 n. 4, 94 S.Ct. at 1651 (Powell, J., concurring in result in part).[10]

Moreover, in none of the post-*Arnett* cases which the plaintiff has cited was there a contrary holding. In *Indiana State Employees Association v. Boehning*, 511 F.2d 834 (7th Cir. 1975), the employee had not been afforded any hearing at all either prior to or after his dismissal, and thus the court concluded that *Arnett* was not controlling in this situation. In *Roane v. Callisburg Independent School District*, 511 F.2d 633 (5th Cir. 1975), the employee was afforded a hearing after his dismissal, but the court still ordered reinstatement because the record failed to show that there had been *just cause* for the dismissal. *Id.* at 639. Finally, in *Mattern v. Weinberger*, 519 F.2d 150 (3rd Cir. 1975), the question was not whether a person's employment could be terminated without a pretermination hearing, but whether *welfare benefits* could be recouped without a prior hearing. The court held that this question was squarely decided by the Supreme Court in *Goldberg v. Kelly, supra*, 519 F.2d at 159–64.

### 3.

### Impartiality of Grievance Committee

The plaintiff's claim that she is entitled to an "impartial" hearing is based on the assumption that she has been deprived of a property interest deserving of constitutional protections. Assuming she has indeed been so deprived, the court finds no merit in her claim of partiality.

The plaintiff alleges that the proceedings of the Grievance Committee which reviewed Director Avitabile's decision to terminate her were not impartial because at least three members of that Committee had allegedly been involved in earlier phases of the decision. A partial description of the administrative structure of the relevant community action agencies and programs is essential to an understanding of the plaintiff's claim of partiality.

### (a).

Under SBAC's charter all residents of South Boston 18 years and older are members of the organization and are eligible to run and vote in elections held by the general membership. Presumably, the most significant of these elections is for 30 of the 33 seats on the SBAC Board of Directors. The Board of Directors holds the ultimate decision-making authority for SBAC and, through its Executive Director (Nicholas Avitabile) and staff, administers a wide range of SBAC programs. In addition to the 30 directors elected at-large, the Board consists of one representative chosen by each of three committees: the SBAC Head Start Policy Committee, the SBAC Youth Council, and the SBAC Senior Citizens Advisory Committee. The SBAC in turn sends

---

**10.** The plaintiff places particular reliance on *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), where the Court required a hearing prior to the state's termination of welfare benefits. Plaintiff claims that she is in a situation analogous to that of a welfare recipient because the employment of low income persons like herself in a local community action program is in essence an alternative to welfare envisioned by the Economic Opportunity Act. *Goldberg,* however, carefully distinguished between the situation of welfare recipients whose "termination of aid pending the resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits" and the discharged public employee who may have independent resources to overcome a temporary hardship, including a job in the private sector or direct public assistance. See *Arnett v. Kennedy,* 416 U.S. at 169, 94 S.Ct. 1633 (Powell, J., concurring). Moreover, whatever the financial situation of the community action employee, it should not affect the government's substantial interest in guaranteeing a well-managed civil service.

at least one representative to the ABCD Board of Directors, which coordinates Community Action Programs citywide, through its own administrative staff. Apparently the SBAC Board also appoints standing or *ad hoc* committees of its own, including the SBAC Personnel Committee.

Project Head Start is overseen by the SBAC Executive Director, the Project Head Start Policy Committee and the SBAC Head Start Program Coordinator (Mary Beth Lawton). The parents of children in each Head Start classroom under SBAC jurisdiction form their own "parents' committee" which apparently operates in an advisory capacity. The Head Start Policy Committee also has at least one standing committee, the Project Head Start Personnel Committee.

The SBAC Manual for New Employees (1971) indicates that in the event of termination of any employee, the Executive Director of SBAC, upon the request of the employee in question, will ask the "Grievance Committee of the Board" to hear the matter, provided that no other means of agreement proves successful. There is no indication of the permissible bases of the Executive Director's decision or how the members of the Grievance Committee are to be selected.

(b).

The proceedings which ultimately led to the plaintiff's termination began at the "grass roots" with a meeting of the Old Colony Parents' Committee on April 25, 1973. In addition to the parents, Ms. Lawton, Mr. Avitabile and Denise Keating—a member of the SBAC Policy Committee—were also present. The meeting took place some months after the plaintiff had received verbal and written warnings concerning her conduct by Ms. Lawton, the Head Start Program Coordinator. The

written minutes of the Parents' Committee indicate the concern of many members with the plaintiff's inability to control her classroom, leading to various altercations among the children, a general lack of discipline and a break-down in the learning process. After more than two hours of discussion, the parents recommended that Mr. Avitabile terminate the plaintiff, a recommendation with which Mr. Avitabile indicated he was in agreement. In a sworn and uncontradicted affidavit submitted to this court, Ms. Keating indicated that she attended the meeting solely to report the proceedings to the Head Start Policy Committee and at no time expressed a personal opinion on the competence or lack of competence of the plaintiff.[11] On April 30, 1973, the plaintiff was terminated, effective May 4, 1973. On May 1, 1973, she requested that the decision be reviewed through the appropriate Grievance Committee Procedures.

In the period between the plaintiff's request for review of her decision and the start of these proceedings, on May 8, 1973, the SBAC Head Start Policy Committee held its regular meeting. The meeting was attended by Ms. Keating and Richard Thompson. Marcia Mackie, a third member of the Committee, was absent. The sole reference in the hand written notes of that meeting to the plaintiff appears in the second to last paragraph: "The termination of Mary Kelly [sic] was discussed. It was felt by the P.C. that the termination was justified." There is no indication that any vote was taken on the question, or that all members agreed with the decision. Nor do the minutes show what facts were brought to the attention of the Committee or whether the Committee's "feelings" were based upon a *de novo* review of the facts leading to Avitabile's decision or merely a desire to support the administrator in the proper exercise of his discretion. *See Simard v.*

---

11. Ms. Keating did make some general observations on how she felt a headstart class should be run and alluded to past problems which had troubled the Old Colony classroom. Ms. Kelley, of course, had not been employed as a teacher in the Old Colony classroom prior to the 1972–73 school year.

The minutes of the Grievance Committee indicate that Ms. Keating was a member of the Head Start Personnel Committee. The Statement of Agreed Facts (¶ 29) indicates that Ms. Keating was a member of the SBAC Personnel Committee.

522

*Board of Education of Town of Groton*, 473 F.2d 988, 993 (2d Cir. 1973).

The plaintiff's termination was reviewed by an SBAC Grievance Committee in early June. The Grievance Committee consisted of members of the SBAC Personnel Committee, Sister Suzanne Murphy, Joan Wilson and Ms. Keating; and the Personnel Committee of the SBAC Head Start Policy Committee, which included Richard Thompson and Marcia Mackie. Plaintiff was represented at all stages of the Grievance Committee proceedings by counsel of her choice who was permitted full participation in the proceedings, including the right to examine witnesses. Sister Murphy and Mr. Thompson acted as co-chairmen.

The Grievance Committee's first meeting was held on June 6, 1973. Only members of the Committee, Mr. Avitabile, Ms. Lawton, Ms. Kelley, her counsel, and SBAC staff members were present. During this meeting, the plaintiff responded to charges made by Avitabile and Lawton as well as to questions raised by Sister Murphy. Counsel for the plaintiff, in turn, inquired of Avitabile and Lawton about various incidents allegedly involving the plaintiff as well as general procedures in the Head Start Program.

A second session was held on June 12, 1973, and again the plaintiff was present and represented by counsel. At the start of this session, the plaintiff suggested that Ms. Keating should not sit on the Grievance Committee because she had been present at the earlier April 25, 1973 Old Colony Parents' Committee meeting where the termination had been initially requested. In response, Keating explained that she had been at the Parents' Committee meeting only as an observer from the Policy Committee and that she had not participated in the decision of the Parents' Committee in any substantive way. Keating also stated that none of her children had ever attended any of plaintiff's classes, that she had no personal knowledge or opinion as to plaintiff's competence as a Head Start teacher, and that her mind was still completely open as to whether or not plaintiff's employment

had been properly terminated. After Keating had made these statements, the four other members of the Grievance Committee conferred amongst themselves in an executive session and concluded that Keating could fairly continue as a member of the Grievance Committee. When this conclusion was announced, plaintiff's counsel said in substance "Well, I guess it's okay."

. There is no indication that counsel for plaintiff challenged the continued participation of Thompson, Mackie or Keating because of their presence at the May 8, 1973 SBAC Head Start Policy Committee meeting at which the decision to terminate the plaintiff was endorsed.

At the June 12, 1973 session, several parents of children in the SBAC Head Start Program expressed their views about the plaintiff's performance as a teacher. Some endorsed her performance because she was popular with children and aided in their educational development. Other parents were critical of the plaintiff because of her lack of control in the classroom and her seeming failure to do more than baby-sit with the children. SBAC staff members, including Ms. Lawton testified in support of termination. Paula Brown, a Child Field Specialist at SBAC, also submitted a memorandum indicating that the plaintiff was a hardworking and dedicated Head Start employee, but that she simply did not have the ability to be a Head Start teacher.

On June 18, 1973, the Committee held a third meeting. At this time plaintiff's counsel was given an opportunity to summarize the evidence in favor of plaintiff's performance as a Head Start teacher and present final argument. On October 15, 1973, the plaintiff received written notice that the Grievance Committee had noted to uphold her discharge.

The notice indicated that the Committee was unanimous in upholding the decision of Mr. Avitabile; that the Committee was grateful for plaintiff's service; that the plaintiff's record should indicate her "positive points," and that she be given the opportunity to serve in a Head Start position other than as a teacher.

(c).

"It is a matter of black letter law that an impartial tribunal is the *sine qua non* of a full and fair hearing," in those situations where a hearing is required, *Stein v. Mutuel Clerks Guild of Massachusetts, Inc.,* 384 F.Supp. 444, 447 (D.Mass. 1974). This principle applies to both administrative agencies and to the courts. *Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In attempting to avoid even the appearance of unfairness, the courts have identified various situations in which

experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse from the party before him.

*Withrow v. Larkin, supra,* 421 U.S. at 47, 95 S.Ct. at 1464 (footnotes omitted); *See United States v. Wilson,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975) (criminal contempt); *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (pecuniary interest); *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (judge sat as one-man grand jury, punished witness for contempt for failure to answer grand jury's questions).

The Supreme Court's latest discussion of the subject of administrative impartiality came last Term in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). There a Wisconsin doctor challenged a state licensing procedure under which the same administrative board which had investigated charges of alleged unprofessional conduct and had issued a finding of probable

cause would also make a final decision on the revocation of the plaintiff's license. In finding the procedure in that case not to violate due process, the Court noted that administrative tribunals must be presumed honest and that presumption can only be overcome by facts showing a "risk of actual bias or prejudgment." 421 U.S. at 47, 95 S.Ct. at 1464.

Prior to *Withrow,* the First Circuit had taken a similar approach. In *Pangburn v. C.A.B.,* 311 F.2d 349 (1st Cir. 1962), the Board had the dual responsibility of making an accident report and reviewing an examiner's decision that sanctions should be imposed on the pilot involved in the accident. The pilot claimed that the Board could not act as a constitutionally impartial tribunal on his appeal from the examiner's decision because it had already taken the position that the accident was caused by pilot error. The Court found the Board procedures constitutional.

[W]e cannot say that the mere fact that a tribunal has had contact with a particular factual complex in a prior hearing, or indeed has taken a public position on the facts, is enough to place that tribunal under a constitutional inhibition to pass upon the facts in a subsequent hearing. We believe that more is required.

*Id.* at 358.[12]

More recently in *Baszcz v. Board of Trustees of Community College District No. 504, Cook County Illinois,* 400 F.Supp. 675 (N.D. Ill.1975) the court applied *Withrow* in dealing with a college professor's claim that his termination board was partial. In rejecting the claim that the presumption of impartiality had been overcome, the court evaluated the conduct of the hearing, including the extensive record that was made, the ability of the plaintiff to examine witnesses and the opportunity he had to present his

12. The *Withrow* court cited *Pangburn* with approval. 421 U.S. at 40 n. 16, 95 S.Ct. 1456. *Withrow* also detailed a variety of other situations in which the question of administrative impartiality has arisen. The issue seems to have arisen most often in the context of regulatory commission procedures in which the same agency, after a staff investigation, found probable cause to issue a complaint, and then adjudicated charges against a private party. In most cases, the procedure has been upheld. *See generally F.T.C. v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).

own defense. *See also Simard v. Board of Education of Town of Groton*, 473 F.2d 988 (2d Cir. 1973); *Keene v. Rogers*, 316 F.Supp. 217 (D.Me.1970).

█ Although none of these cases is directly on point, they do stand for the general proposition that the presumption of administrative regularity, in those situations in which a hearing is indeed required, can be overcome *only* when actual facts are presented which show a realistic danger of partiality. In this case, those facts are absent.

The only attack on the Grievance Committee's impartiality relates to the presence on that Committee of two individuals, Denise Keating and Richard Thompson, who were also present at the SBAC Head Start Policy Committee meeting on May 8, 1973 which had ratified the decision of Mr. Avitabile to fire the plaintiff.[13] Yet, as noted earlier, the record does not indicate precisely how the Policy Committee arrived at this decision; whether the Policy Committee heard evidence and a formal vote was taken or whether the secretary merely provided a *sua sponte* evaluation of the sense of the meeting, after Avitabile reported his action and his version of the facts. Denise Keating's affidavit indicates that discussion of the subject was not extended and it appears to have come as the final business in a two and one-half hour session. There is no allegation that either Keating or Thompson expressed any opinion on the subject or gave any indication that they had even considered the matter carefully. On this scanty record, there is simply no basis for concluding that there was a significant danger that either Keating or Thompson could not judge the plaintiff's grievance fairly. *Accord, Simard v. Board of Education of Town of Groton*, 473 F.2d 988, 993 (2d Cir. 1973).

Apart from the seemingly marginal participation of Keating and Thompson in the earlier proceedings, the record of the Grievance Committee hearing belies any claim of partiality. The hearing was conducted on three separate days, involving several hours of discussion and testimony. It was presided over by Sister Suzanne Murphy, who was the only member of the Grievance Committee to actively inquire of the participants and whose integrity is unquestioned here. The plaintiff was present at all stages of the proceedings, and was represented by counsel who actively inquired of witnesses and of Avitabile and Lawton. The plaintiff was given an opportunity to respond to charges at length and her counsel was able to question those who had brought complaints against her. The Board listened to and carefully inquired of Lawton and Avitabile as well as other colleagues of the plaintiff who expressed their professional judgment that plaintiff should not continue in her position. The Board devoted an entire session to hearing from parents, some of whom supported the plaintiff's retention and some of whom did not. It also had available the memorandum of an SBAC child specialist who had worked with the plaintiff and concluded that she was a dedicated teacher who simply could not control a classroom. At its final session the Committee gave plaintiff's counsel an opportunity to make a closing statement.

The Committee deliberated for several weeks on the conflicting evidence. Its final decision upholding plaintiff's termination was unanimous. Yet that decision was an exceedingly narrow one. It clearly concluded that plaintiff should not be in charge of a classroom, but noted that she could contribute to the program in other ways. Indeed, the Committee took pains to recommend that "[s]tress be given in Mrs. Kelly's [sic] folder to her positive points" and that

---

13. The plaintiff makes no challenge here to Ms. Keating's presence at the original Old Colony Parents' Committee meeting on April 25, 1973. The Committee's response to counsel's challenge to Ms. Keating's presence on the Grievance Committee, made at the outset of the Grievance Committee's second day of hearings, further buttresses the finding of impartiality. The Committee was careful not to deal with the matter summarily but to recess and deliberate in executive session on its decision. At the very least, the Committee was aware of the importance of impartiality.

she be given an opportunity to participate in Head Start in another capacity.

To be sure, it might have been better practice for SBAC Head Start Policy Committee members not to sit on the Grievance Committee. But in view of the circumstances here, the care with which the Grievance Committee went about its task, the evidence that plaintiff, albeit a popular teacher, had difficulty controlling a classroom full of pre-school youngsters, and the recommendation of the Committee that the plaintiff be allowed to continue in the program in another capacity, this court cannot say that the prior limited involvement of Keating and Thompson with this case tainted the Grievance Committee proceedings, or that the plaintiff did not receive an impartial hearing before that Committee.[14]

### III

### FIFTH AMENDMENT

The plaintiff also claims that the procedures used by SBAC in connection with her discharge violated HEW or former OEO regulations thereby depriving her of due process under the fifth amendment.[15]

Plaintiff's theory on this aspect of her claim is premised on the assumption that the federal government's presence in Community Action programs makes the actions of SBAC surrounding the plaintiff's discharge "federal actions" subjecting the defendants to the strictures of the due process clause of the fifth amendment.

 Unfortunately for plaintiff, there is no statutory counterpart to 42 U.S.C. § 1983 covering federal officials acting "under color of federal law." *Soldevila v. Secretary of Agriculture*, 512 F.2d 427, 429 (1st Cir. 1975). Accordingly, "[w]hile federal officers may, at times be subject to suit for unconstitutional behavior [citation omitted], there is no cause of action against private parties acting under color of federal law or custom." *Fletcher v. Rhode Island Hospital Trust National Bank*, 496 F.2d 927, 932 n. 8 (1st Cir. 1974). The threshold question on this phase of plaintiff's complaint therefore, is whether the defendant agencies can be termed "federal officers" in order to subject them to the strictures of the due process clause of the fifth amendment.

### A.

### Federal Officials

Twelve years ago, the Congress of the United States enacted a program designed to "eliminate the paradox of poverty in the midst of plenty" by passing the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2701

---

**14.** In both cases cited by the plaintiff in her memorandum in support of an earlier motion for summary judgment, *King v. Caesar Rodney School District*, 380 F.Supp. 1112 (D.Del.1974) and *Stein v. Mutuel Clerks Guild of Massachusetts*, 384 F.Supp. 444 (D.Mass.1974), members of the grievance committees involved had done far more than merely review some of the *prima facie* evidence in support of a proposed personnel action.

In this case, unlike the *King* and *Stein* cases, none of the pleadings or affidavits show that any of the members of the Grievance Committee had heard *all* the relevant evidence or made any statement whatsoever about the plaintiff's suitability to continue as a Head Start teacher. Only two members of this Committee had heard *some* of the *prima facie* evidence in support of the plaintiff's termination. One of the members who had some prior familiarity with the plaintiff's case, Denise Keating, has sworn in her affidavit that at the time of the Grievance Committee hearings her mind was still completely open as to the plaintiff's compe-

tence or incompetence to continue as a Head Start teacher. (Keating Affidavit, ¶ 9). The other one of these members, Richard Thompson, is now deceased.

**15.** The alleged jurisdictional basis of plaintiff's due process claim is 28 U.S.C. § 1332.

In *Hampton v. Mow Sun Wong*, 88 U.S. 426, 96 S.Ct. 1895, 1904, 48 L.Ed. 495 (1976). the Court noted:

The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment. Although both Amendments require the same type of analysis . . . the two protections are not always coextensive.

The plaintiff does not challenge the discretion of the Executive Director to terminate members of the SBAC Head Start staff, nor is there claim that the charges made against the plaintiff, if believed by a properly constituted body, would be an illegitimate basis on which to terminate her.

*et seq.* The legislation provided for a variety of federally-funded and administered programs such as VISTA and the Job Corps. At the same time, however, the Congress noted: "[i]t is the sense of the Congress that it is highly desirable to employ the resources of the private sector of the economy of the United States in all such efforts [to eliminate poverty.]" 42 U.S.C. § 2701.

One area in which the private sector, as well as state and local governments, were invited to join was in the establishment of Urban and Rural Community Action Programs. Title II of the Economic Opportunity Act provided for the creation of Community Action agencies throughout the nation through which federal funds would be channelled to fuel locally developed and administered programs to eliminate poverty. A Community Action agency could be a state, a political subdivision of a state, a combination of political subdivisions or a private agency or subdivision established with local political approval. 42 U.S.C. § 2790. The agency would be run through a board representing major interest groups in the area, without a representative of the federal government, and would be responsible for determining "major personnel, fiscal and program policies, to approve overall program plans and priorities and to assure compliance with conditions of, and approve proposals for fiscal assistance." 42 U.S.C. § 2791(e); 45 C.F.R. § 1015.735–19 (1974). Twenty percent of a Community Action agency's support must be from nonfederal sources. 42 U.S.C. § 2812(c).

In reporting out the bill which eventually became the Economic Opportunity Act, the House Education and Labor Committee summarized the philosophy of the community action concept.

[It] is based on the belief that local citizens know and understand their communities best and that they will be the ones to seize the initiative and provide sustained, vigorous leadership. It is based, too, on the conviction that communities will commit their ideas and resources and assume responsibility for developing and carrying out local action programs. Thus, the role of the Federal Government will be to give counsel and help, *when requested,* and to make available substantial assistance in meeting the costs of those programs.

1964 U.S.Code Cong. & Admin.News, 2901 (emphasis in original).

One Community Action program to which the Congress gave specific sanction was Project Head Start. Although Project Head Start funding could be obtained by private agencies other than those engaged in Community Action, Congress expressed the clear preference that Project Head Start be part of a given locality's Community Action Program. 42 U.S.C. § 2809(a).

■ Viewed in this context, there can be no serious claim that ABCD, or its delegate, SBAC, constituted federal agencies or instrumentalities of the federal government. These particular Community Action agencies were established as private, non-profit, organizations, whose mission was to plan and develop programs to combat poverty on a local level. They were conceived, not to extend federal control to all aspects of the War on Poverty, but to do just the opposite: to provide fertile ground for the growth of local initiatives to deal with local problems. And their constituency was limited to those in the community they were created to serve.

■ The plaintiff argues, however, that in spite of its philosophy, the administration of the Community Action programs has resulted in pervasive federal control. Paragraph 27 of the Amended Complaint lists seventy-four separate restrictions imposed on ABCD by the federal government including certain restrictions on funding, internal fiscal controls, regular audits, assurances against discrimination and the requirement for fair grievance procedures. As the Supreme Court has only recently noted in another context: "[a]lthough such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs—or of state governmental bodies—into federal governmental acts. *Cf. Jackson v. Metropolitan*

Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 267 (1972)". *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (footnote omitted). *Cf. Molinar v. Western Electric Co.*, 525 F.2d 529 (1st Cir. 1975).[16]

### B.

### Regulations

Even assuming that the defendants' actions are subject to the due process clause of the fifth amendment, the plaintiff's complaint on that score is without merit.

 In Paragraphs 37 and 38 of the Amended Complaint plaintiff alleges HEW and ABCD have established certain requirements for termination of Head Start teachers. In Paragraphs 39 and 40, the plaintiff alleges that these requirements have been violated. The Amended Complaint is silent on the source of these "requirements" although the original complaint implied that the HEW requirements were to be found in *Head Start Child Development Program, A Manual of Policies and Instructions*, Sep-

tember 1967—*Office of Child Development Manual 6108–1*, as updated by *Transmittal Notice* 70.2, August 10, 1972. The original complaint indicated that the ABCD "requirements" were to be found in the *ABCD Personnel Policies Manual*, effective February 23, 1972. The 1967 Child Development Manual does provide a mechanism for processing employee grievances which must include: a specification of charges; an opportunity to be heard; representation by another person; a speedy and written decision; and a procedure for appeal to the governing board *or* its appropriate committee. *Policy Manual 20; Community Action Memo 23–A.* All of those rights have been provided the plaintiff. The 1972 update to the 1967 Manual cited by the plaintiff, was issued under 42 U.S.C. § 2809 which deals with participation of parents in the program as opposed to 42 U.S.C. § 2796, which deals with personnel procedures. Moreover, the update affects only pages 10, 11, 12 of the 1967 Manual as opposed to the grievance procedures found on page 21. And a review of the update indicates nothing in that document appearing to have any direct relevance to the grievance procedures outlined in the Manual.[17]

---

**16.** In *Orleans*, the Court held that a Community Action agency was not a federal agency or instrumentality within the meaning of the Federal Tort Claims Act, 28 U.S.C. § 2671. As partial support for that conclusion, the Court cited the legislative history of the Economic Opportunity Act with its emphasis on local control of community action programs, as well as *Hines v. Cenla Community Action Committee, Inc.*, 474 F.2d 1052 (5th Cir. 1973), in which the Court of Appeals had refused to find a community action agency subject to the due process clause in a suit by a former employee challenging his termination. *Orleans*, therefore, while not directly on point, does buttress the conclusion reached in the text.

Of course, even on some theory of "federal action" comparable to "state action" under section 1983, the plaintiff's claim must fail. There is no evidence that HEW or any other federal agency was in any way involved in the actual decision to discharge the plaintiff. *See Hines v. Cenla Community Action Committee, Inc.*, 474 F.2d 1052 (5th Cir. 1972).

**17.** Plaintiff's allegations in paragraphs 39(c), (d) and (g) seem also to be based on the Manual. Plaintiff alleges in paragraph 39(c) that the regulations provide for a right of appeal to the

governing board of the program. The Manual indicates, however, that an appeal may be taken to the "governing board *or* its appropriate committee."

The plaintiff also alleges in paragraphs 39(a), (b), (e), (f) and (h) a variety of requirements whose source remains unclear. In any event, the record shows that most of these so-called requirements have been satisfied. The ABCD personnel policies manual does establish criteria for termination (pages 44–46), and the SBAC Manual for New Employees provides rules and regulations for employees. And the plaintiff was given several months to improve her performance before complaints by parents required the Executive Director to make a decision.

There is no indication that the Head Start Policy Committee or the Executive Director approved either termination criteria or the specific grievance procedures that were used in this case. Even if no prior formal approval was given to these criteria and procedures, there is no basis for claiming that the plaintiff was prejudiced as a result. The basis of the Grievance Committee's decision was hardly arbitrary, bottomed simply on the plaintiff's inability to control her classroom. And there is no

Finally a review of the termination procedures found in the 1972 ABCD Personnel Policies Manual indicates that those procedures were substantially complied with and, in any event, the plaintiff has not shown any prejudice from alleged failure of the defendants to comply.[18]

Accordingly, for the reasons stated in this opinion, judgment will be entered in favor of the defendants.

indication that the absence of prior formal approval of the precise grievance procedure used here in any way tainted the hearing itself.

18. The ABCD Personnel Policies Manual (1973) provides that an employee of that city-wide organization may be discharged for, *inter alia*, gross misconduct, falsification of statements or "unsatisfactory performance of duty." After proper warnings have been given and a period for self-improvement provided, the appropriate supervisory official may discharge the employee, subject to reversal by a Grievance Committee made up of members of the Board. The procedure for terminating an employee as well as for the institution and processing of grievances are spelled out in the ABCD Personnel Policies Manual. There is no indication in the record that the plaintiff is considered an employee of ABCD for purposes of the Manual. Indeed, the stipulation of the parties (¶ 13) indicates that, except for funding, ABCD and SBAC are autonomous.